17 06 9 0. No Ryan Rogers at all talents by Ellen Bullock versus Principal Andy Walsh at all. I can't please the court. Counsel. My name is Ellen Bullock and along with Kristen sober. We represent plaintiff appellant Noah Rogers in this matter. The trial court does not weigh evidence, nor is it concerned with the credibility of witnesses. Rather, it may only consider the evidence in any inferences therefrom in the light most favorable to the party resisting judgment, notwithstanding the verdict. And we stand here today resisting judgment, notwithstanding the verdict. When I gave closing argument to the jury after five days of argument evidence, I asked a simple question. Why didn't high school assailant Andrew McConaughey and his teacher, high school coach Keppel collide at the gym door? The middle school students were the eyewitnesses. The teachers weren't the eyewitnesses because they were not in eyesight range of these students when the beating happened. The middle school students were the eyewitnesses. Now, they were in the pool hallway with Noah Rogers. He was beaten and he was left unconscious on the floor. Kyle Schmitz says that the fighting lasted three or four minutes and no teachers were around. Matthew Sarver said it was six to seven minutes and no teachers were around. Hunter Sherman, he ran to find Nisler and he caught up with Nisler. He says that Andrew stopped, beat up Noah, stopped and then walked through the gym doors. Andrew walked casually like nothing even happened. No teacher caused Andrew to leave. Nathan Schultz says that it was two to five minutes. Andrew was just right next to the gym doors so he just turned around and walked in. No adult ended the fight. It ended on its own. So, all of these students say there was a period of two to seven minutes. Now, the teachers and the administrators including Dean Hurley say that, including Principal Thurman, say two to seven minutes is too long a time for the teacher to be absent. The teacher should be absent thirty seconds, maybe a minute. So, that two to seven minutes and it's years later and we don't have their written statements that would have said at the time what they thought the duration of the beating was. We don't have those statements. Those have been destroyed. But the students say on the stand, under oath to that jury, in that courtroom, it was two to seven minutes. Now, Principal Walsh says the fact that Mr. Keppel was moving in proximity to where the situation was happening, I believe that's what stopped the you don't know because you weren't there and you don't know because you never took a statement from your employee, Coach Keppel, and you don't know because you never asked Coach Keppel where he was other than vaguely he was in the gym. You never had him write that down. You never took an audio tape statement or made a record. But you believe. And you believe that the fact that he was moving in the situation happened stopped the aggression of Andrew. Well, the students don't say that. Now, the trial court on J&OB says, and it echoes Thurman and the defense's point of view, strategy of the case. They say it is a reasonable inference nonetheless to infer Keppel did respond to this emergency and he was there in such time to see Andrew standing over Rogers. Now, let me talk about that. That's an inference. What do we know about J&OB? The trial court doesn't get to make an inference. Well, let me ask you this. What was your burden of proof? What did you have to prove? That the defendants were negative or? Willful and wanton. Absolutely willful and wanton. So, isn't that what this is all about? Conscious disregard. Absolutely what it's all about. Yes. But willfulness and wantonness can be found in circumstantial evidence. So willfulness and wantonness can be found in the destruction of the statements. The destruction of the statements, the spoliation of the statements could have gone to the consciousness of guilt or the willfulness and wantonness of supervision. Because that was at issue at this trial. So, that could have been evidence. Certainly it was brought in as evidence of spoliation, but it was also brought in as evidence of consciousness of guilt as to the supervision. The willfulness and wantonness of the supervision. Because a guilty mind would have the impression, I don't know if I want those statements around. Even though there's a state law, the Illinois Student Records Act, that says they must be kept for five years. And it was admitted that that rule was in effect. Now, Keppel says, he gives a lot of different stories. But he says he came out of the gym. He was standing in the middle of the gym. He heard about this. He came out of the gym. And he saw Andrew standing over Noah, shaking his finger at him. Now, that's a rather strange thing to see. I don't know that many high school bullies that, you know, shake their finger at their battered victim. But he says he saw that. None of the kids say they saw that. None of the kids say they saw Keppel come and see that. Keppel says, he saw Andrew standing over Noah, shaking his finger at him. And then he says, we locked eyes. He got bug-eyed. He looked like a deer in the headlights. And then he took off running down the hallway. Remember, the students testified clearly he didn't run. He walked casually, as if nothing had happened. And they said he didn't go down the hallway. He turned and went right into the gym. That's the question. If Keppel is telling the truth, why didn't they collide in the gym hallway? The jury had every right to weigh Keppel's credibility and to find the middle school students more credible on that issue. Now, here's the last thing on Keppel. On the day of the incident, he ran after Noah was already injured and unconscious in the pool hallway. Later in the day, a few minutes after that, he ran to get Noah's grandmother, Terri Woods. Terri Woods was a cafeteria worker at the school. And Terri Woods says that Keppel said to her, I was only gone a few minutes. So she took that to mean, and the jury could take that to mean, gone from the gym a few minutes. And that's why he wasn't there. Now, I want to turn to the map. Because there's a problem with the map. And it's not a problem for us, the plaintiffs. It's a map is a simple trial tool. A jury can understand better when they can see than when they can hear some sorts of evidence. Certainly the evidence of where Nisler was. Nisler was the middle school teacher. Both teachers were gone for a period of two to seven minutes. It seems to me that what the trial judge said was that leaving middle school and high school students alone for two to seven minutes is a matter of law. It's not willful and wanton misconduct. And I would disagree that it is not willful and wanton. I think that's where he's coming from. I'm not sure there's a dispute about the facts. Well, there is a dispute about the facts that he says Keppel arrived. He makes the inference that Keppel arrived. But I agree that he does say that. I would point out that I don't think that a teacher merely leaving students unsupervised is insufficient to establish willful and wanton misconduct. The law says that. If you look at Doe v. Ortega Peron, which is an Illinois Supreme Court case, they say, and it's dicta, but it's just as important as the dicta cited by the trial court or the appellees, they say, and this is the Illinois Supreme Court in 2004, a teacher's presence may prevent unsafe activity or untoward behavior. For instance, a teacher may intervene in a fight between students. And isn't that what the jury is expecting? But that doesn't answer the question whether the teacher's absence for two to seven minutes constitutes willful and wanton or reckless behavior on the part of the school district. I agree. But it does establish as a legal principle that those facts are important, and it's not a given that the absence is in effect. Common sense dictates that if there's teachers around, that the students are less apt to fight in the presence of adult supervision. Absolutely. That is exactly what common sense would establish. Absolutely. If I may return to the map. The map, which, if you're honest, it's in the appendix. The proper map is in the appendix. But it was a large visual aid at trial. It was demonstrative certainly when we brought it to the courtroom as a large poster board. That's just simple trial practice. But it was a map of the school premises. But it became evidence when the witnesses, seven witnesses, stepped up and made marks on the map. And you can see those in the appendix. The marks are important in two distinct ways. One way the marks are doing during this time. It goes to Nisler's credibility. It also goes to his whereabouts and his supervision of his students, the middle school students, during the fight or the beating. So Nisler places his red dot in the ag hallway as close to the pool hallway as you would want to be. And you would want to be as a teacher closer, not farther, from your middle school student when he's getting beaten unconscious. And your other middle school students who are watching it as eyewitnesses. But the students who ran to get him, the students who ran to get him placed their dots much further down the ag hallway. Hunter has two dots. One where he first saw Nisler and one where he, then Nisler went before turning around to come back. Matthew Sarver's are almost at the end. They're either in the corner, Matthew says he was near the cafeteria, or they're in the corner. Nathan Schultz also again puts his dot in that same corner area between the cafeteria and the ag hallway. Now I don't know if we really know and I don't know that it matters other than it does raise another issue on JNOB, another important issue on JNOB. Because Andrew Wise, the superintendent of Olympia's supervision. He had been the hearing officer for Andrew McConaughey's expulsion hearing and he had been the FOIA officer who denied the Rogers the statements. So he was heavily involved back in 2011. But then he was also the current superintendent. He was asked to shade in the reasonable vicinity of supervision. He was asked, is supervision, reasonable supervision in your school eyesight? No, not that. Is it within hearing range? No, not that. Is it within a measurable distance, like you could say in feet or how far away? No, it's not that. What is supervision? Supervision is being within the reasonable vicinity where you can respond to something that happens to your students. So then he was asked to shade in on the map the area of reasonable supervision. And he used a green hash mark to shade it in. And at one point he says, and this would have caught the jury's ear because it certainly caught mine. At one point he says, I don't want to shade the whole thing. Because the area of reasonable supervision was getting pretty big at that point. So I said, but you have to shade in the whole thing. So he continued to shade. And then we went over and said, does it include the gym? Yes. Does it include the pool hallway? Yes. Does it include the ag hallway? Yes. This is reasonable supervision. So he says, is that all? That's all. Now you look at the map. Calvin Bird, who had a bird's eye view, no pun intended, because he was the student who was with Nisler at the front of the line. Calvin Bird places himself and Nisler both. And he says he was at Nisler's side in the outside the reasonable supervision. The map is a visual aid. It's important to our understanding of the case. And it shows yet another way in which the jury was within its province to judge the evidence and weigh the evidence presented to it on willfulness and wantonness. It absolutely is. A school district cannot be liable for mere negligence. But willfulness and wantonness can be proved by direct or circumstantial evidence. And there is circumstantial evidence of consciousness of guilt and of conscious disregard of student safety. These administrators and teachers admit that a student has a right to safety in their school. That's why the school resource officer exists. That position exists for reasons of school safety and student violence. The superintendent at the time, Hutchinson, agreed with that. So all of these pieces of evidence were in the jury's province, within the jury's purview, and within the jury's decision. And that cannot be overturned, I think. That jury's verdict, and it was a reasoned verdict. It included reasonable amounts. It was a careful verdict that included not doubling damages. Because he gave damages to the parents under the family medical act, the jury didn't give damages for medical expenses to no one. There was an incredible amount of conscientious responsibility shown by that jury, which should not be overturned. Thank you. If you can use in 25 words or less, can you tell me exactly what the evidence was of willful and wanton, reckless conduct of a public school resident? What exactly established your case for willful and wanton misconduct? It was deviation from standard operating policies, and there were several deviations from standard operating policies. One was the not was if they left the vicinity of reasonable supervision, their students' reasonable supervision, either Kepler, Nisler, or Boehm, because they would have standard operating policies, would have had them do it in the reasonable area of supervision where they were supposed to be supervising their students. And one would be that destruction, exfoliation of the records. I don't have enough time to delve into that on this oral argument, but that is an important piece of evidence. Under their own handbook, they collected these written statements that must be kept under the Illinois student record there. We've read the briefs, and I understand your argument. Thank you. Thank you. Thank you. Ms. Hobson. May it please the court, counsel? My name is Kathleen Hobson, and I wanted to start off, I think my understanding of counsel's argument regarding the map really goes to an argument where she's trying to establish a heightened duty of care. That's the best way that I'm understanding it. I don't believe that it's being used to argue that there was willful and wanton conduct, but I think that really, when you go underneath all of that argument, what it really is, is that she's arguing that there is a heightened standard of care. So what we need to do is step back and look at what is the guiding law and guiding principles in this situation. As the court has already recognized, in this situation, the school and its employees are immune for ordinary negligence, both under the Tort Immunity Act and under the Illinois school code. Just like a parent can only be liable for willful and wanton, the school employees in the school district can only be liable for willful and wanton conduct. And as the court is aware, there are public policy reasons for having that rule of law. So starting with that rule of law, this situation, in the reply brief, plaintiff kind of termed the case as a breach of the duties of safety. It's not a case of the breach of duties of safety. The allegations and the complaint in the case was tried on whether or not there was a breach of the duty of supervision in a willful and wanton manner. And I think where some of the overlay or, I don't know if the word should really be confusion, but where it kind of gets confusing to me is when you're talking about supervision, obviously when you're talking about supervising children, safety is a component of that, because why else would you be supervising kids? And then you have the language in the willful and wanton, in the definition, in the code, that references the word safety. But this case is not about a breach of duty of safety. It's whether there's a breach of a duty of supervision in a willful and wanton manner. And that is looked at, you know, from Barr versus Cunningham, that that is looked at under the totality of the evidence or totality of the circumstances in the case to go to trial. So we're looking at the totality of all the evidence that came out of trial. The conduct can't be more mere inadvertence, incompetence, or unskillfulness. And then to lay on this, of course, we prevailed on a J&OB, and in the J&OB, my position is that a J&OB standard includes a total failure of lack of evidence to prove any necessary element of the case, and the necessary element in this case that was not proven was willful and wanton conduct. And that willful and wanton conduct is not, it has to be connected to the breach. There has to be a willful and wanton conduct in that supervision. And I think that things are, arguments are being made that it's willful and wanton to destroy statements, which is a whole other issue, but it's in the supervision. It's not about whether or not statements were retained in the school record. Before I get on a little more in the analysis of it, I wanted to point out that in my aptly brief, I did make a motion to strike the argumentative portions of the Avalon Statement of Facts, and that all of the facts that were presented both with comment and with argument that do not fairly accurately represent the record, and I believe that that also occurred in the reply. And I know this court is doing a de novo review, so I know you are yourselves reading all of the, that you've read all the transcripts and you know what all the evidence is, so I don't want to go tit for tat and say, you know, this was said and this isn't in the record, because ultimately I'm not even sure when you read all of it if you remember what we said, because you have formed your own reading of the case when you do the de novo review, but I do want to point out that that did also occur in the reply brief. And also with regards to the reply brief, since I have the opportunity in this argument to address this, a new case was raised in the reply brief that was the Darabai Ortega-Puron v. Chicago Board of Education, and new cases aren't typically allowed to be raised in reply briefs. It wasn't necessarily raising a new argument, so I didn't file a motion to strike, but if the court is going to consider it, I would ask for an opportunity to respond in writing. I think that what the case says wasn't fairly portrayed in the brief, so I just wanted to raise that as well, if the court would allow me to do that, if they are going to consider a new case that's raised for the first time in the reply brief. So when we're looking at the analysis of the case, first off we've got the counts related to the claim that there's a breach of the duty of supervision, and then you have the spoliation. The spoliation count is a derivative claim. First you have to analyze the supervision issue, because you don't even get to the spoliation issue if there is no proof of the willful and wanton conduct. And so what there is a complete absence of is any evidence in this case that the school was required to have a resource officer there if the resource officer was absent for the day. There is no evidence in the case as to what that resource officer would have been doing at that point in time. Would he have been assigned in that hallway? Would he have been on his lunch break? Would he have been in class presenting something? Would he have been doing something else, doing paperwork? There's no evidence whatsoever that the fact that the resource officer, who there is no requirement that there be a substitute called in, that that would have made any difference in this case. Where was Noah's teacher? His teacher was with his class. Yes, his class was stretched out as they're going online, but as we know from the case law, the teacher doesn't have to keep a student within eyesight at every single moment in performing their duties. So he's with his class, and Noah's at the end of the line. There is, counsel raises that there's a dispute as to whether Keppel was in the gym or not. So you do make the inference in favor of the plaintiffs on that issue, if you believe. But taking the inference from the grandmother that he wasn't there, wherever he was, all of the evidence from the students was that he responded. And so there again, I don't think that that shows the utter disregard, conscious disregard, utter indifference to the children. So I think that the  conduct that was shown in the case, and there was many, and that is why the J&OV was granted. Yes. I mean, of course, had moved for summary judgment and directed verdict on the issue. I mean, our position, of course, was that the issue should never have been brought to the jury because the evidence wasn't there, but it was presented to the jury. And the law does allow for a J&OV to be entered. I do understand that, you know, that obviously a jury verdict is something that you do want to take seriously and is not something you take lightly. But still, the laws do protect the school districts from ordinary negligence. And in this case, there simply was not any evidence of Wilklin-Watton conduct that was presented. That's your view of the case, though the jury had a different view of the case. Wilklin-Watton really depends on the circumstances of each case, and it's a question of fact. For the judge to overturn the jury's verdict, he or she had to find that the evidence, when viewed in light most favorable to plaintiff here, so overwhelmingly favored your client, that the jury's decision should be thrown out. Yes. When you read the judge's order, he's drawing inferences from the facts. And that's not the judge's role, or I would like you to speak to the inferences that the judge has drawn in his order. So the judge, his inferences, like he makes reference to two to seven minutes. So he gives the maximum amount of minutes that could be, that they could have not been right there in that hallway, either of the teachers involved. So I mean, I think that the case law says that you make the inferences in favor of plaintiff. So I think that inference is favoring plaintiff. I think the only inference, from my understanding of the judge's decision, would be the inference that he made that Keppel was there, because plaintiff does point out from Ms. Woods' testimony that he had told her that he had just been away for a few minutes. So we don't know what exactly happened there. But what we do know, what the evidence does show, is that he responded. So wherever he was, he responded. He had been with his students. The court is also drawing inferences with regard to spoilation of the evidence. In paragraph 12, the court says, it is reasonable to infer that this was negligent conduct to destroy records, but not willful and wanton. I don't understand why it's within the trial court's purview to make that finding a fact. Paragraph 12, A7 of Plaintiff's Well, this court's going to make its own inferences. So in a sense, what the judge decides, you're not ruling whether or not his inferences are correct, because you're going to make your own inferences from the evidence. Are we allowed to make inferences from the record? You're allowed to, any inferences that are made, are made in favor of plaintiff. You're looking at the totality of the evidence, and the circumstances and situation, which is clear that there's no evidence that the plaintiff's complaint said that this was a fighting hallway, and not one single student said that this was a fighting hallway, that there was any issues with fighting at the school. But this is a situation where there's an interface between middle school students and high school students. So could the jury have found that there is a heightened duty of care where that interface occurs? No. I don't think they can find a heightened duty of care, because I think it's the court's role to determine what a duty  of care, there's no heightened duty of care. Like in common carriers, I know there's a heightened duty of care in common carriers, to have a heightened duty for the safety on all the times that you're on that transportation, but there isn't a heightened duty of care. Counsel, that's two minutes. So, you know, I would also, by some briefs, that it's hard to get through all of the arguments, and especially about the disfoliation of evidence, I have presented those arguments in my brief, and we would ask that this court affirm the trial court. If you have any other questions that you would like for me to address. All right. Thank you. Counsel, some rebuttal. I'm rebuttal. Willfulness and wantonness is a sui generis, or a factual matter. Totality of the circumstances, the Barr v. Cunningham case says it's always a totality of the circumstances, and it is. And those circumstances are factual, of course. The case I would use to guide my understanding of the totality of the circumstances, not to decide the case, because that's factual, and that's for the jury, but to guide my understanding of what circumstances are relevant for consideration, is the state of Stewart case. And that says there are factors, deviation from standard operating procedures. We went through, at trial, the handbooks of the middle school and the high school, both. And there were, in those handbooks, several important operating procedures. One was the School Records Act, Student Records Act was adopted in the handbook. Another was that after there's been an incident, witness statements are to be written down, taken in writing, of eyewitnesses to any incident of violence or bullying or fighting between students. So that was done. And then, of course, they're supposed to be saved for five years, or maintained for five years. That's in the handbook, and that's standard operating procedure. So all of the surroundings of the Wilfrem Watton spoliation go to the standard operating procedure this school was operating under. And there was a deviation from that standard operating procedure, an illegal deviation of that standard operating procedure. That's certainly relevant. Also, there was no resource officer. It was we don't know where the resource officer was supposed to be. We don't know if he was supposed to be in his office taking notes, or if he was supposed to be giving a presentation. Doesn't that just beg the question of where Nisler and Keppel were supposed to be? Doesn't that just add another factual issue as to who's supposed to be with those students in that hallway, in either a short period of time, response time, or any other great reason? Then we draw the conclusion, then, that as a matter of law, Wilfrem Watton has conducted for a school, as we believe, high school and middle school students, unsupervised for two to seven nights. No, that's not a matter of law. So what is it about this background situation that says you've got to get in there and supervise these students during this period of time, because there's something... This isn't just your ordinary group of students. There's something that puts you on notice. You need to be there. That's the third Stewart factor. We're jumping from the first to the third. An unjustifiably inadequate response to a known danger. Danielle Rogers attended a parent meeting before the beginning of the school year, and they told her, we know it's a problem with the intermingling of the students in certain common areas, high school and middle school. So we are aware of that, and we watch that carefully. Dean Hurley said the same thing. Yeah, we're aware that that's a problem, the high school and middle school, so we have extra careful supervision of them during those times when they're together. And then, also the school... Your Honor, if I may, the school district witnesses themselves testified that two to seven minutes was unreasonable. It's their own testimony. It's not my students. The middle school students who testified, my witnesses, they just said what the time was. They didn't say whether it was reasonable or unreasonable. They're just kids. But the teachers themselves, Principal Thurman and Dean Hurley, both said two minutes too long, seven minutes too long. That's less than a minute. What do we call unreasonable conduct in the law? I didn't hear that. And what do we call unreasonable conduct in the law? We call it negligence, don't we? Well, no, you can have... Well, negligence, willful wantonness is a form of negligence, and it can be unreasonable, it can be willful wanton, as well as being negligent, certainly. And the third steward factor is an unjustifiably lengthy response time. Of course, that's where the students have said that the response time... There was no teacher present, no teacher responded, and it was three to four minutes, six to seven minutes, three to four minutes, two to five minutes. These are the students testifying, and it's in the brief. And whether it was... I can't remember if there was evidence. Were students yelling, hey, yelling from teachers, hey, come stop it? Yes, there was evidence of that, but no one came. Keppel says he came, but the students do not say that. But there was evidence that someone was shouting out for somebody to come Yes, there was evidence. Before I sit down, no law says leaving students alone unsupervised fails to establish willful wanton. There's no case in Illinois, or no law on the statute books that says leaving the students alone unsupervised fails to establish willful wanton. Two to seven minutes is never willful wanton. That's not the law, Your Honors. Thank you. All right. Well, thank you both for your arguments here this morning. This matter will be taken under advisement, but the disposition will be...